RECEIVED
IN ALEXANDRIA, LA.

APR 2 1 2010

TONY R. MOORE, CLERK
BY————— DEPUTY

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**ALEXANDRIA DIVISION**

| | |
|---|---|
| JOHN P. GAUTHIER | CIVIL ACTION NO. 09-2083 |
| VS. | SECTION P |
| | JUDGE TRIMBLE |
| SHERIFF DOUG ANDERSON, ET AL. | MAGISTRATE JUDGE KIRK |

## REPORT RECOMMENDING DISMISSAL OF SOME BUT NOT ALL OF PLAINTIFF'S CIVIL RIGHTS CLAIMS

*Pro se* plaintiff John P. Gauthier, proceeding *in forma pauperis*, filed the instant civil rights complaint pursuant to 42 U.S.C. §1983 on November 13, 2009.[1] Plaintiff is an inmate in the custody of the Louisiana Department of Public Safety and Corrections who is incarcerated at the Avoyelles Parish Detention Center (APDC), Marksville, Louisiana. Plaintiff complains of various circumstances and conditions of confinement. He originally sued Avoyelles Parish Sheriff Doug Anderson, APDC Warden Glen Booty, Captain Peter Loften and the Louisiana Department of Corrections. In amended complaints he dismissed Sheriff Anderson and joined Warden Presly Bordelon as

---

[1] Plaintiff filed his complaint in the United States District Court for the Eastern District of Missouri. Since venue was improper, that Court ordered transfer of the complaint pursuant to 28 U.S.C. §1406(b). See rec. doc. 5.

a defendant. In his original and amended complaints plaintiff requested only injunctive relief; however, in subsequent amended complaints he requested an unspecified amount of monetary damages based upon his exposure to second-hand tobacco smoke and spinal meningitis, as well as injunctive relief.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the Court. For the following reasons, it is recommended that plaintiff's many and various complaints (**EXCEPT THOSE RELATED TO HIS EXPOSURE TO ENVIRONMENTAL OR SECOND-HAND TOBACCO SMOKE**) be **DISMISSED WITH PREJUDICE** as frivolous and for failing to state a claim for which relief may be granted; it is further recommended that plaintiff's motions for a Temporary Restraining Order (TRO) or preliminary injunctive relief be **DENIED**; finally, it is recommended that all claims against the LDOC be **DISMISSED WITH PREJUDICE** because that defendant is entitled to sovereign immunity under the Eleventh Amendment.

### *Background*

### 1. *Original Complaint [rec. doc. 1]*

In his original complaint, plaintiff complained that defendants Warden Booty and Captain Loften have denied him the

2

right to practice his religion. He complained that Booty and Loften have also denied him the "right to an inmate law library and counsel." He claims that Loften is punishing him for an unknown reason by placing him in administrative segregation because of over crowding. He claims that Loften threatened to transfer him for filing administrative grievances. Finally, he complained that he was confined to lock down for 43 days and during that time he was provided only 2 hours of recreation.

He prayed for injunctive relief: "To help me practice my First and Eighth Amend[ment] rights, freedom to practice religion, freed[om] of inmate counsel and the use of the law library, and freedom to outside counsel."

## 2. Motion for Appointment of Counsel [rec. doc. 3]

On November 27, 2009 petitioner filed a *pro se* Motion for Appointment of Counsel.

## 3. First Amended Complaint [rec. doc. 4]

On the same date he filed a hand-written *pro se* pleading which has been construed as an Amended Complaint. Therein plaintiff complained that his prisoner grievances have been ignored; that he has been denied placement in an open dorm by defendant Loften; that the air quality (tobacco smoke) and temperature (too cold) have caused him to get sick and he is

3

charged $7.00 for medication; that the facility is overcrowded and that the LDOC is aware of the conditions complained of; and, that plaintiff must stay in lock down because of the overcrowding.

## 4. Second Amended Complaint [rec. doc. 6]

On December 17, 2009 plaintiff filed another hand-written pleading which has been construed as an amended complaint. Therein he inquired as to the status of his original complaint seeking injunctive relief and stated, "This Jail (Avoyelles Parish Jail) I think is tr[y]ing to retaliate against me. Therefore I'm again requesting an injunction the same as before." He also alleged that "[t]he staff here including Cpt. Peter Loften is discriminating against me because of my charges. I can't even make trustee here and I have 16 months left. My sentence is 2 yrs. with good time... I can't even get work release..." Thereafter, he specified the following complaints concerning conditions of confinement:

a. Laundry is done every two weeks. According to plaintiff, this "unsanitary practice" causes boils which in turn leads to staph infections.

b. On Friday, Saturday, and Sunday the supper consists of 1 piece of bologna, 4 pieces of bread and 1 apple or 1 fruit bowl.

4

According to plaintiff, on December 12, 2009 his request for another bag lunch was denied.

    c. Inmates "... are getting sick due to the showers..." because the water is either scalding hot or freezing cold. Despite numerous complaints from plaintiff and others, nothing is done to correct the problem. Plaintiff claimed that he contracted an illness on two occasions and his visits to the nurse cost him $14.00.

    d. Finally plaintiff again reiterated his chief complaint – overcrowding.

## 5. Third Amended Complaint [rec. doc. 7]

On January 7, 2010 plaintiff filed yet another complaint in which plaintiff complained of retaliation as follows, "This morning (Jan. 1st) Captain Peter Loften showed discrimination and partiality against me in the form of blue jeans and a tee shirt. The Jail is allowed to wear personal clothing due to a shortage of jail house uniforms. He told me that he didn't want me walking around looking like an employee. There are over 400 inmates in this little jail and I'm the only one he took anything like that from." Plaintiff also claimed, "I'm afraid of the outcome for taking this action. This captain then stated as I was walking away that this is a new year and I'm going to show

you — — what I'm about." Plaintiff understood this statement to
be a "verbal threat."

**6. *Fourth Amended Complaint [rec. doc. 8]***

On February 4, 2010 petitioner filed yet another *pro se*
complaint. In that complaint he requested an unspecified amount
of money damages claiming that his exposure to second-hand
tobacco smoke caused him to develop bronchitis. According to
plaintiff, he has had to obtain a "breathing pump" and
antibiotics at his own expense. He complained that although the
jail has a no smoking policy, cigarettes are sold at the
commissary.

He also complained that he was exposed to spinal meningitis
when an inmate with that disease transferred into APDC from
another prison. According to plaintiff, the prison is now
quarantined and some inmates, but not plaintiff, have been
provided with "immune booster pills."

**7. *Amend Order [rec. doc. 9]***

On February 4, 2010 the undersigned completed an initial
review and directed plaintiff to "... precisely state what **EACH
DEFENDANT** did to violate **HIS** constitutional rights with respect
to the facts alleged and further, he shall state with
specificity **THE NATURE AND EXTENT OF THE INJURIES, PREJUDICE,** or

6

other **HARM HE CLAIMS TO HAVE SUSTAINED AS A RESULT OF THE
ALLEGED CONSTITUTIONAL VIOLATIONS**." [rec. doc. 9] On February
11, 2010, the undersigned denied plaintiff's request for
appointment of counsel. [rec. doc. 10]

### 8. Fifth Amended Complaint [rec. doc. 11]

On February 24, 2010 plaintiff filed another amended
complaint. He requested dismissal of the Sheriff as a defendant
and alleged that Warden Booty had resigned on January 11, 2010.
However, sometime before that plaintiff claimed that he was
summoned to Warden Booty's office and met with him, plaintiff's
father, Captain Loften, and an unnamed Detective with the
Avoyelles Sheriff's Office. At the meeting, Booty justified
Loften's behavior and accused plaintiff of having a "smart
mouth." Booty also told plaintiff to stop submitting frivolous
ARP grievances such as the grievance submitted on December 19,
2009 wherein plaintiff complained that he was forced to sit in
the dining hall for 4 hours while a shakedown was being
conducted in his dorm.

Plaintiff also reiterated his complaint concerning exposure
to second hand tobacco smoke. He claimed that he was sent to the
Huey P. Long Hospital and diagnosed with chronic bronchitis and
placed on an antibiotic fo 7 days. He complains that he is still

7

exposed to tobacco smoke. He alleged that on February 4, 2010, the entire facility was vaccinated as a result of exposure to an inmate with meningitis.

He complained that on January 7, 2010 Loften "showed a form of retaliation" by refusing to allow plaintiff to wear his blue jeans and T-shirt, although other inmates were permitted to do so. Plaintiff was forced to return the clothing to his family.

He complained that on the same date he was verbally threatened by Loften as follows, "This is a new year and I'm going to show you – what I'm about."

Plaintiff complained that he met with a Health Department representative and voiced his complaints about the toilets and showers.

Plaintiff also complained that he is denied access to the law library. He claims that this may result in "... injury to my case for lack of information."

Plaintiff claimed that he was denied the right to practice his religion when he was placed in lock down for 2 ½ months. During that time, he was not permitted to go to church.

He claimed that his numerous requests for "work-release" have been denied because he was convicted of carnal knowledge of a juvenile, an offense which claims does not disqualify him

under La. R.S.15:711.

Plaintiff explained that he was suing Warden Booty "... for allowing deliberate violations of my rights and for allowing Capt. Loften to act in an unlawful manner." He sued Loften "... for the numerous threats that he inflicted on or against me." He again prayed for compensatory damages for his exposure to second-hand smoke which has caused him to cough, have headaches, and become short of breath. He also requested an injunction directing the prison to institute a non smoking dorm. He also requested an injunction reducing the population of his dorm to 76 prisoners. He also requested unspecified documents. [rec. doc. 11]

## 9. *Sixth Amended Complaint - seeking TRO [rec. doc. 13]*

On March 8, 2010 plaintiff filed yet another amended complaint seeking immediate injunctive relief. In support of his complaint he alleged that on March 2, 2010 he filed a grievance after his TV privileges were suspended due to another inmate's behavior. Upon filing the grievance he was summoned to the office of Warden Presley Bordelon where he "... received malicious threats and verbal abuse due to cursing." According to plaintiff, the Warden "threatened" plaintiff's family in some unspecified manner. He was threatened with transfer to another

facility should he file any further grievances.

**10. Report and Recommendation [rec. doc. 15]**

On March 9, 2010 the undersigned recommended that the pleading seeking a preliminary injunction or TRO be denied because plaintiff's pleading did not comply with FRCP Rule 65 and the jurisprudence.

**11. Seventh Amended Complaint [rec. doc. 16]**

On March 9, 2010 plaintiff filed another complaint substituting defendant Presley Bordelon for defendant Anderson.

**12. Objection to Report and Recommendation [rec. doc. 17]**

On March 17, 2010, plaintiff filed an objection to the Report and Recommendation and alleged that on February 26, 2010 "... two (2) inmates were moved into C Dorm with the intent to do me bodily harm..." He then alleged that on March 13, 2010 he was physically assaulted by one of these inmates. Plaintiff alleged that he "... found out that Warden Glenn Booty told this said inmate that I plaintiff was a 'rat' or tattle tale..." While the inmate was being escorted from the dorm because he was found to be in possession of a cell phone, he kicked plaintiff in the face causing a bloody nose and an abrasion on or near his left eye. Plaintiff requested a TRO "... to have these acts of violence against me stopped..." Plaintiff provided a copy of an

incident report which verifies the fact of the assault.
According to the report, plaintiff was transferred from C Dorm
and placed in A Dorm "... because of other offender stating that
they was going to harm..." plaintiff.

**13. Order [rec. doc. 18]**

On March 30, 2010 Judge Trimble rejected the Recommendation
and remanded the motion for TRO for further consideration.

**14. Seventh Amended Complaint [rec. doc. 19]**

On April 12, 2010 plaintiff filed yet another complaint
which alleged that he "strongly feel[s]" that he is being
retaliated against by Warden Bordelon because the Warden placed
plaintiff in holding cells for the 16 day period between March
21 and April 6, 2010. Plaintiff slept on the concrete floor for
16 to 18 hours per day – only being afforded a mattress for the
period from 9 p.m. to 5 a.m.

Plaintiff further claimed that as of that date he was in
sick bay awaiting surgery for a cyst on his lower back which had
become inflamed.

### Law and Analysis

**1. Screening**

When a prisoner files a complaint in a civil action seeking
redress from a governmental entity or officer or employee of a

11

governmental entity, the district court is obliged to review the complaint as soon as is feasible and to dismiss the case if it determines that the complaint is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. See 28 U.S.C.A. §§ 1915 and 1915A; see also 42 U.S.C.A. § 1997e(c) (providing that a district court shall on its own motion or the motion of any party dismiss a complaint by a prisoner regarding prison conditions if the court is satisfied the complaint is frivolous, malicious, falls to state a claim upon which relief may be granted, or seeks monetary relief from an immune defendant).

A claim is frivolous if it has no arguable basis in law or fact. Nietzke v. Williams, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). A claim has no arguable basis in law if it is based on an indisputably meritless legal theory, "such as if the complaint alleges the violation of a legal interest which clearly does not exist." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir.1998) (quotation omitted).

A civil rights plaintiff must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. Schultea v. Wood,

12

47 F.3d 1427, 1433 (5th Cir.1995).

Plaintiff's complaints and exhibits present the best case which could be presented by plaintiff under the circumstances. The undersigned is convinced that further amendment of the pleadings would serve no useful purpose. Plaintiff has set forth a number of claims and each has been addressed below. Accepting all of plaintiff's allegations as true, and, giving plaintiff the benefit of every doubt, the undersigned concludes, for the reasons stated hereinafter, that the following complaints should be dismissed with prejudice.

## 2. The Louisiana Department of Corrections

Plaintiff has sued the Louisiana Department of Public Safety and Corrections because the Department is aware of the various conditions plaintiff has complained about. [See rec. doc. 4] However, the Louisiana Department of Public Safety and Corrections is immune from suit under the Eleventh Amendment. See Champagne v. Jefferson Parish Sheriff's Office, 188 F.3d 312, 313 (5th Cir.1999); see also Rogers v. Department of Corrections, 263 F.3d 163 (5th Cir. 2001). Eleventh Amendment immunity applies to all suits brought against "States and their agencies ... regardless of the relief sought." P.R. Aqueduct & Sewer Auth., 506 U.S. at 146, 113 S.Ct. 684 (citing Cory v.

13

White, 457 U.S. 85, 90-91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982)). Therefore, whether plaintiff seeks injunctive relief or monetary damages, his suit against the LDOC must be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B).

### 3. Practice of Religion

Plaintiff, in his original complaint, has alleged that the defendants have interfered with his practice of religion, but he provided no information in support of this conclusory claim. [rec. doc. 1] In a subsequent pleading [rec. doc. 11] he alleged that the denial of the right to practice his religion arose during the 2 ½ month period he was confined in lock-down. According to the pleadings, during that period he was not allowed to attend the regular prison church services. However, he did not otherwise allege any interference.

Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. Nevertheless, lawful incarceration, by its very nature, brings about the necessary withdrawal or limitation of many privileges and rights. The limitations on the exercise of constitutional rights arise both

14

from the fact of incarceration and from valid penological objectives.  See *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

The standard for evaluating an inmate's claim that a prison regulation or practice improperly restricts his right to the free exercise of his religion requires the court to evaluate the regulation or practice in order to determine whether it "is reasonably related to legitimate penological interests." *Id.* at 349.  The "reasonableness" of a regulation or practice is evaluated based upon the following inquiry: (1) Is there a valid, rational connection between the prison practice and the legitimate governmental interest put forward by prison officials to justify the practice; (2) Are there alternative means of exercising the right that remain open to prison inmates, that is, are inmates allowed other means to express their religious beliefs on a general level; (3) What impact will accommodation of the asserted constitutional right have on guards and other inmates and on the allocation of prison resources generally; and, (4) Are alternatives to the prison practice available that would accommodate the inmates' rights at a *de minimis* cost to valid penological interests? *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), *Green v. Polunsky*, 229 F.3d

15

486, 489-90 (5th Cir.2000). Each factor need not be considered, and the factors need not be evaluated evenly. <u>Scott v. Mississippi Dep't of Corrections</u>, 961 F.2d 77, 80 (5th Cir.1992).

Further, it must be noted, that with regard to the first prong of the <u>Turner</u> test, plaintiff has not alleged that prison officials have <u>prohibited</u> him from practicing his religion.  The second and forth prongs of the <u>Turner</u> test, address whether or not "alternative means" of practicing his religion have been made available to the plaintiff.  In analyzing the availability to inmates of "alternative means" of exercising their religion, however, "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, <u>the prison affords the inmates opportunities to exercise their faith</u>." <u>Freeman v. Texas Department of Criminal Justice</u>, 369 F.3d 854, 861 (5th Cir.2004); <u>Adkins v. Kaspar</u>, 393 F.3d 559, 564 (5th Cir. 2004).  Plaintiff has not claimed that he was <u>denied</u> the right to practice his religion at any time.  In <u>O'Lone v. Estate of Shabazz,</u> <i>supra</i>., the inmate-plaintiffs complained that they were not allowed to attend the weekly Jumah services because of their assignments to work details outside the main prison grounds. <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. at 345-46. The Supreme Court considered the evidence supplied by the prison administration  regarding security needs, rehabilitative

16

needs, and the impact of alternative accommodations; this
evidence was evaluated in the light of those rights actually
retained by the inmates to practice their religion. The Court
then noted that the plaintiff- inmates were not deprived of <u>all</u>
forms of religious exercise. Based upon these facts, the
Supreme Court held that the "ability on the part of [the inmates]
to participate in <u>other religious observances</u> of their faith
supports the conclusion that the restrictions at issue here were
reasonable." *Id.* at 352.

Read liberally, plaintiff's complaint suggests not that he
was denied the right to practice his religion, but rather, that
he was denied the privilege of attending weekly services during
the 10 week period he was confined in lock down – a disability
apparently shared by all inmates assigned to that cell block. He
has never alleged that he was deprived or denied all forms of
religious exercise and therefore, this aspect of his complaint
must be dismissed as frivolous.

**4. Access to Courts**

Likewise, with regard to his claim that he has been denied
access to the prison law library, he has alleged no facts to
support that claim.  In his original complaint he alleged that
the defendants "denied him the right to an inmate law library
and counsel." [rec. doc. 1] He prayed for an injunction

17

directing the defendants to permit library access. Plaintiff was directed to amend and allege "... the nature and extent of the injuries, prejudice, or other harm he claims to have sustained as a result of the alleged constitutional violations." [rec. doc. 9] Thereafter, plaintiff filed his fifth amended complaint, in which he alleged that the denial he complained of might result "... in injury to my case for lack of information." [rec. doc. 11]

"It has long been recognized that prisoners generally enjoy the constitutional right of access to the court." Jones v. Greninger, 188 F.3d 322, 325 (5th Cir.1999). See Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The right of access to the court is not unlimited, however, and includes "only a reasonable opportunity to file non-frivolous legal claims challenging [the prisoners'] convictions or conditions of confinement." Id. (citing Lewis v. Casey, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Moreover, to prevail on an access-to-the-court claim, a prisoner must demonstrate that he has suffered "an actual injury" stemming from the alleged defendants' unconstitutional conduct. Chriceol v. Phillips, 169 F.3d 313, 317 (5th Cir.1999);

Ruiz v. United States, 160 F.3d 273, 275 (5th Cir.1998).

Plaintiff claims that he has been denied access to the law library, however, he has not shown that he has been denied access to this or any other Court, nor has he alleged any injury or prejudice resulting from the claimed denial. His access to court complaint should be dismissed as frivolous.

## 5. Conditions of Confinement

Plaintiff has complained of various conditions of confinement, including: (1) overcrowding [rec. doc. 1, 4]; (2) poor air quality and exposure to second hand tobacco smoke [rec. docs. 4, 8, 11]; (3) exposure to cold temperatures [rec. doc. 4]; (4) unsanitary laundry practices [doc. 6]; (5) showers which are either too hot or too cold [rec. doc. 6]; (6) inadequate meals on the weekends [rec. doc. 6]; (7) exposure to spinal meningitis [rec. doc. 8]; (8) being required to sit in the dining hall for 4 hours without a rest room break on one occasion while prison authorities conducted a "shake down;" [rec. doc. 11]; (9) conditions in lock down (having only been allowed use of a mattress during the period from 9 p.m. to 5 a.m. from March 21 - April 6, 2010). [rec. doc. 19]

Such claims asserted by convicted prisoners, are analyzed under the Eighth Amendment.  In order to prevail on such a

19

claim, plaintiff must establish that the conditions of confinement were sufficiently harmful to evidence deliberate indifference to his needs.

"The Constitution 'does not mandate comfortable prisons,' ... but neither does it permit inhumane ones...." Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Prison officials must provide humane conditions of confinement, including adequate food, shelter, medical care, and reasonable safety. Farmer, 511 U.S. at 832 (citations omitted).

"A two-part test determines whether a prisoner has established a constitutional violation." Harper v. Showers, 174 F.3d 716, 719-20 (5th Cir.1999) (citing Woods v. Edwards, 51 F.3d 577, 581 (5th Cir.1995)). The prisoner must show: "first, that the deprivation alleged was sufficiently serious ...; and second, that the prison official possessed a sufficiently culpable state of mind." Herman v. Holiday, 238 F.3d 660, 664 (5th Cir.2001). For the second element of a conditions of confinement claim, the Supreme Court has defined "culpable state of mind" to mean that the "official acted with deliberate indifference to inmate health or safety." Id. "It is ... fair

20

to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." <u>Farmer,</u> 511 U.S. at 836. At this step, the prisoner must show that the "defendant officials '(1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn and (2) ... actually drew an inference that such potential harm existed.'" <u>Herman</u>, 238 F.3d at 664 (quotation omitted).

As noted above, plaintiff initially complained of overcrowding [rec. doc. 1, 4], however, notwithstanding a specific order to do so [rec. doc. 9] he provided nothing other than a series of conclusory allegations to support his overcrowding claim, and, more importantly, he failed to allege any harm which resulted from that condition or any harm likely to result from that condition.

Likewise, his complaint of unsanitary laundry practices was conclusory, at best. Although he alleged that the practice could cause boils and staph infections, he did not claim that he (or any other inmate) suffered from those conditions. [doc. 6]

His complaints about the showers being either too hot or too cold, resulted in, at worst, a *de minimis* injury which

necessitated only treatment from the jail nurse on two occasions. [rec. doc. 6]

His complaint concerning inadequacies of the meals on the weekends likewise alleged no physical harm. [rec. doc. 6]

His complaint that he and fellow inmates were exposed to another inmate who had spinal meningitis also alleged no harm. [rec. doc. 8] Furthermore, he later alleged that other inmates were provided "immune booster pills" [rec. doc. 8] and that on a February 4, <u>all inmates, including plaintiff</u>, were vaccinated as a result of their exposure to the patient in question. [rec. doc. 11]

His complaint about being required to sit in the dining hall for 4 hours without a rest room break on one occasion while prison authorities conducted a "shake down" [rec. doc. 11] also set forth a claim that does not rise to constitutional proportions.

Plaintiff's complaint concerning conditions in lock down (having only been allowed use of a mattress during the period from 9 p.m. to 5 a.m. from March 21 - April 6, 2010) likewise does not state a claim for relief. [rec. doc. 19]

In short, these claims, even taken together, do not establish deliberate indifference on the part of the remaining

22

defendants because "extreme deprivations are required to make out a conditions-of-confinement claim." <u>Davis v. Scott</u>, 157 F.3d 1003, 1005 (5th Cir.1998) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

Although the conditions of confinement may be uncomfortable, plaintiff's complaints do not either allege or establish that he suffered an <u>extreme deprivation</u> of the "minimal civilized measure of life's necessities." <u>Davis</u>, 157 F.3d at 1005 (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Nor did plaintiff claim to have been<u> completely denied a basic human need</u>. See <u>Woods</u>, 51 F.3d at 581 (noting that, although the temperature was "uncomfortable" and the conditions were "nauseous," there was no complete "deprivation of facilities for elementary sanitation" giving rise to unconstitutional confinement); cf. <u>Palmer v. Johnson</u>, 193 F.3d 346, 352 (5th Cir.2000) (concluding that complete deprivation of toilets denied a basic element of hygiene in violation of the Eighth Amendment, as did prolonged exposure to "extreme cold" out-of-doors without shelter).

Taken separately or as a whole, the complained of conditions of confinement (other than the second hand tobacco

smoke exposure[2]) do not entail the wanton and unnecessary

---

[2] Plaintiff's complaint, insofar as it complains of his exposure to second-hand cigarette smoke, must also be analyzed under the above cited Eighth Amendment jurisprudence. However, since this claim arguably states a claim for which relief might be granted, it deserves separate analysis.

In Helling v. McKinney, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 2481-882 (1993), the Supreme Court held that prison officials may violate the Eighth Amendment's prohibition against cruel and unusual punishment by exposing inmates to an excessive level of environmental tobacco smoke ("ETS"). To obtain relief, a prisoner must prove not only that the level of ETS to which he is exposed is unreasonable, but also that prison officials have shown "deliberate indifference" to the health risks associated with second hand smoke. In Helling, the Supreme Court identified both objective and subjective elements. Objectively, a plaintiff must show that he himself is being exposed to unreasonably high levels of ETS. The objective factor not only embraces the scientific and statistical inquiry into the harm caused by ETS, but also whether society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Subjectively, the plaintiff must prove deliberate indifference, considering the officials' current attitudes and conduct and any policies that have been enacted.

The adoption of a smoking policy bears heavily on the inquiry into deliberate indifference. See also, Whitley v. Hunt, 158 F.2d 882, 887-88 (5th Cir.1998); Rochon v. City of Angola, 122 F.3d 319, 320 (5th Cir.1997); Wilson v. Lynaugh, 878 F.2d 846 (5th Cir.), cert. den., 493 U.S. 969, 110 S.Ct. 417, 107 L.Ed.2d 382 (1989).

To show he was exposed to unreasonably high levels of ETS, a plaintiff must ordinarily provide statistical and scientific evidence to support the objective component of his burden of proof. To that end, Courts may take judicial notice, pursuant to Fed.R.Civ.P. rule 201, that the United States Surgeon General's June 2006 report concluded that scientific evidence shows there is no safe level of or exposure to second hand smoke. However, while the Surgeon General's Report may satisfy the objective aspect of deliberate indifference, a plaintiff is nevertheless required to demonstrate the subjective component as well, and this is where his claim fails.

On February 4, 2010, plaintiff filed his Fourth Amended Complaint. For the first time he requested money damages and alleged that he had contracted bronchitis "due to second hand smoke in this facility..." He alleged that the condition was being treated by a "breathing pump" and antibiotics. Contrary to his initial averment, plaintiff conceded "The entire Jail has no-smoking signs everywhere but yet they still allow smoking in this jail. The sell cigarettes [at the] commissary. I had a bronchitis flair-up on the outside but was told that I didn't need a pump unless I got around second hand smoke. I have been around second hand smoke for over 120 days and no change in the smoking part." [rec. doc. 8] His Fifth Amended Complaint [rec. doc. 11] likewise complained

infliction of pain and therefore do not rise to the level of
cruel and unusual punishment. See <u>Rhodes</u>, 452 U.S. at 347; see
also <u>Estelle</u>, 429 U.S. at 104 ("Punishment rises to the level of
cruel and unusual only if it involves an " 'unnecessary and
wanton infliction of pain.' ")(quoting <u>Gregg v. Georgia</u>, 428
U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

## 6. *Retaliation*

In several of his complaints, plaintiff alleged that he was
the victim of retaliation. It is well established that prison
officials may not retaliate against an inmate because that
inmate exercised a right guaranteed to him under the
constitution. <u>Woods v. Smith</u>, 60 F.3d 1161, 1164 (5th Cir.1995),
*cert. denied*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747
(1996). To state a claim of retaliation, a prisoner must allege
facts which establish that (1) he exercised  a specific
constitutional right, (2) the defendant had the intent to
retaliate against him for his exercise of that right, (3) a
retaliatory adverse act occurred, and (4) causation.

---

about his exposure to second-hand smoke.

It thus appears that his complaint, insofar as it alleges exposure to second-
hand or environmental tobacco smoke, should survive initial review. A separate
order will be prepared directing service of process of this remaining claim.

Causation requires a showing that "but for the retaliatory motive the complained of incident ... would not have occurred." Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir.1997) (quoting Woods, 60 F.3d at 1166), cert. denied, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997); McDonald v. Steward, 132 F.3d 225 (5th Cir. 1998). "The inmate must allege more than his personal belief that he is the victim of retaliation." Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir.1999). "The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." Id. (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995), cert. denied sub nom Palermo v. Woods, 516 U.S. 1084(1996)).

Conclusory allegations are insufficient to establish a "chronology of events" as required to support a claim that prison officials have retaliated against a prisoner for exercising his rights. See Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir.1999); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995).

In his second amended complaint [rec. doc. 6] he alleged, "This Jail ... I think is tr[y]ing to retaliate against me..." That conclusory allegation is insufficient to establish

26

retaliation.

In his third amended complaint [rec. doc. 7] he alleged that he was a victim of retaliation when Captain Loften refused to allow him to wear blue jeans and a tee shirt instead of his prisoner uniform. He made the same allegation in his fifth amended complaint [rec. doc. 11] where he referred to Loften's actions as "a form of retaliation." In *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir.2006), *cert. denied*, 549 U.S. 1038, 127 S.Ct. 596, 166 L.Ed.2d 443 (2006), the Fifth Circuit announced a *de minimis* standard for prisoner retaliation claims: "Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." "[T]his [ *de minimis* ] threshold is intended to weed out only inconsequential actions and is not a means to excuse more serious retaliatory acts by prison officials." *Id.* Clearly, plaintiff's allegation concerning the denial of his right to wear blue jeans and a tee shirt, does not pass the *de minimis* test.

In his sixth amended complaint [rec. doc. 13], he complained that after he filed a grievance concerning television privileges he was summoned to the Warden's office where he "... received malicious threats and verbal abuse ..." and was

27

threatened with a transfer should he continue filing frivolous grievances. Again, plaintiff fails to state a retaliation claim. Verbal threats, without more, are *de minimis* acts which, as were shown above, cannot support a retaliation claim under the Constitution.

Finally, in his seventh amended complaint [rec. doc. 19] plaintiff he alleged his strong feelings that he is being retaliated against by Warden Bordelon who placed him in detention for 16 days in March-April, 2010. However, as is shown elsewhere, plaintiff has consistently maintained that his placement in detention was occasioned by overcrowded conditions in the prison dorms. (In his original complaint [rec. doc. 1] plaintiff complained that he had been placed in administrative segregation for an "unknown reason;" he later claimed that his placement was due to overcrowding. In his first amended complaint [rec. doc. 4] he complained that prison officials denied him placement in an open dorm and maintained his placement in lock down because of overcrowding.) In this instance, plaintiff is again unable to pass the *de minimis* threshold and fails to establish that "but for the retaliatory motive the complained of [placement in detention] would not have occurred." Johnson v. Rodriquez, 110 F.3d 299, 310 (5th

Cir.1997).

### 7. *Work Release/Trusty Status*

Plaintiff also alleged that he was a victim of discrimination because he was denied trustee or work-release status based upon his crime of conviction - carnal knowledge of a juvenile. However, plaintiff has neither a liberty nor property interest in the work release program and therefore any due process claim in this regard would be frivolous. La. R.S.15:1111, the statute establishing the work release program, provides in part, "The Department [of Corrections] shall establish rules for the administration of the work release program and shall determine those inmates who may participate in the release program. Any convict sentenced to imprisonment at hard labor shall be eligible at any time during his sentence to participate in the work release program..."

In Welch v. Thompson, 20 F.3d 636 (5th Cir. 1994), the Fifth Circuit determined that La. R.S.15:1111 entrusts the actual operation of the work release program to the LDOC. The court further determined that the statute does not dictate to the LDOC who it must put on work release. In short, the Fifth Circuit has held that "...La. R.S.15:1111 does not create a liberty interest subject to the Due Process Clause." Welch v.

29

Thompson, 20 F.3d 636, 644 (5th Cir. 1994). Since the statute does not create a protected liberty interest for eligible prisoners, there can be no deprivation of a liberty interest protected by the due process clause of the Constitution, and therefore plaintiff cannot show that a constitutional right has been violated.

To the extent that plaintiff also implies that he was deprived of a "property interest" as opposed to a liberty interest in violation of the due process clause, such an argument also lacks an arguable basis in law and fact. In Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Supreme Court concluded that in order to have a property interest in a benefit, a person must have more than a "unilateral expectation" of it. Rather, he must "have a legitimate claim of entitlement to it." Id. (emphasis supplied). Thus, the "property interest" protected by the due process clause of the Fourteenth Amendment is defined by the concept of "entitlement," which in turn describes "the security of interests that a person has already acquired in specific benefits." Id. at 576, 92 S.Ct. at 2708. In other words, a person's interest in a benefit is a property interest only "if there are such rules or mutually explicit understandings that

30

support his claim of entitlement to the benefit..." <u>Evans v. City of Dallas</u>, 861 F.2d 846, 848 (5th Cir. 1988). Plaintiff can point to no rule or understanding which entitles him to participate in the program. In any event, the Fifth Circuit has also held that prisoners have no property interest work-release employment. <u>Bulger v. U.S. Bureau of Prisons</u>, 65 F.3d 48 (5th Cir.1995).Plaintiff is not entitled to participate in the Louisiana work-release program and therefore to the extent that he implies that he was denied either a liberty interest or a property right in violation of the Due Process Clause, such claims are subject to dismissal as frivolous.

**8. *Failure to Protect and Motion for TRO***

On March 8, 2010 plaintiff sought a TRO "... enjoining the defendants ... from verbal threats, attempted retaliation, cruel and unusual punishments, discrimination, and intimidation of the... plaintiff." [rec. doc. 13] His motion for immediate injunctive relief was based on one of the incidents described above. According to plaintiff he filed a grievance because his TV privileges were denied because of another inmate's misbehavior. According to plaintiff, Warden Bordelon threatened with a transfer should he continue to file grievances, and Bordelon then verbally abused him.

31

On March 9, 2010, the undersigned recommended dismissal of the request for emergency injunctive relief because plaintiff failed to comply with the formal requirements of Rule 65 of the Federal Rules of Civil Procedure and because plaintiff failed to allege specific facts to demonstrate that immediate and irreparable injury would result. [rec. doc. 15]

On March 17, 2010 plaintiff objected to the Report and Recommendation and alleged that on February 26 "... two inmates were moved into C-Dorm with the intent to do me bodily harm..." He further alleged that on March 13 one of the inmates assaulted him.  According to plaintiff he "found out" that Warden Booty had told the inmate that plaintiff was a "rat." Plaintiff concluded by claiming he "strongly" felt that the act was an act of retaliation. He then requested that the TRO prohibit "these acts of violence against me."

Plaintiff attached an incident report which confirmed that he had been attacked by the other inmate. In addition, the incident report indicated that plaintiff was moved to another Dorm "... because [the] other offender [stated] that they [were] going to harm [plaintiff] if he would stay in the dorm." [rec. doc. 17]

Based on the incident report, the Court declined to dismiss

32

the motion for TRO and instead referred this matter back to the undersigned for further investigation. [rec. doc. 18]

On April 12, 2010 plaintiff filed yet another pleading. Therein he alleged that he was transferred to the holding cells for 16 days between March 21 - April 6. He then alleged that as of April 7, the date of his pleading, he had been transferred to sick-bay. [rec. doc. 19] In this pleading, plaintiff requested "... immediate assistance for future offenses from said warden..."

### a. *Failure to Protect*

To the extent that plaintiff now seeks both monetary damages and injunctive relief with respect to his implied claim that the defendants failed to protect him from inmate violence, his claims are frivolous.

In order to establish a failure-to-protect claim a prisoner must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. In order to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Neals v. Norwood, 59 F.3d 530, 533 (5th Cir.1995)

(citations and internal quotation marks omitted). Further,

"[d]eliberate indifference must be viewed from [the defendant's]

perspective at the time in question, not with hindsight's

perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th

Cir.1998). Moreover, "deliberate indifference cannot be inferred

merely from a negligent or even a grossly negligent response to

a substantial risk of serious harm." Thompson v. Upshur County,

Texas, 245 F.3d 447, 459 (5th Cir.2001).

Plaintiff implies that the defendants purposefully moved

the offending inmates into his dorm and thereafter told the

offending inmates that plaintiff was a "rat" thus setting in

motion a chain of events which resulted in the assault on

plaintiff. Upon closer inspection, however, plaintiff has

clearly provided nothing other than conclusory allegations to

support that contention. By his own admission, plaintiff could

only state that he "strongly" felt that the transfer of these

inmates was an act of retaliation.

Indeed, the facts, as established by the incident report,

belie plaintiff's claims of fault.

According to the incident report, plaintiff was immediately

moved from the dorm housing the offending inmates when prison

officials became aware of plaintiff's danger. (Indeed, as shown

34

above, the report indicated that plaintiff was moved to another Dorm "... because [the] other offender [stated] that they [were] going to harm [plaintiff] if he would stay in the dorm." [rec. doc. 17] Furthermore, plaintiff was thereafter, by his own admission, transferred from that dorm to the cell blocks and thereafter to the infirmary where he remains at this time.

### b. TRO OR PRELIMINARY INJUNCTION

Plaintiff has still not cured the deficiencies of his requests for TRO; his subsequent pleadings do not pray for specific injunctive relief[3]; and, those subsequent pleadings belie plaintiff's claim that he is in any immediate danger. On further review, as directed by the Court, the undersigned is convinced that plaintiff is not entitled to a TRO or other injunctive relief.

### Conclusion and Recommendation

All of plaintiff's claims against the Louisiana Department of Public Safety and Corrections should be dismissed because that defendant is immune from suit.

---

[3] As shown above, plaintiff's original motion for TRO prayed only for an order "... enjoining the defendants ... from verbal threats, attempted retaliation, cruel and unusual punishments, discrimination, and intimidation of the... plaintiff." [rec. doc. 13] Thereafter he prayed for "... immediate assistance for future offenses from said warden..."[rec. doc. 19]

Further, plaintiff's complaint, insofar as he has alleged that the defendants (a) interfered with the practice of his religion; (b) denied him access to the courts; (c) exposed him to unconstitutional conditions of confinement (prison overcrowding, cold temperatures, unsanitary laundry practices, cold/hot showers, insufficient meals, exposure to meningitis, denying him the use of a rest room for 4 hours, and the conditions of confinement in the lock down cell); (4) retaliated against him; or (5) unlawfully denied him the opportunity to participate in either the work-release or trusty programs, fails to state a claim for which relief may be granted and is frivolous.

However, plaintiff's claim concerning his exposure to environmental tobacco smoke should survive this review.

Finally, plaintiff's requests for a TRO or preliminary injunction should also be denied.

Therefore,

**IT IS RECOMMENDED** that plaintiff's civil rights complaint raising the claims outlined above, and his requests for TRO or a preliminary injunction be **DISMISSED WITH PREJUDICE** as frivolous and for failing to state a claim on which relief may be granted in accordance with the provisions of 28 U.S.C. §§ 1915 and

36

1915A;

**PLAINTIFF'S CLAIMS CONCERNING HIS EXPOSURE TO SECOND HAND TOBACCO SMOKE SHOULD, HOWEVER, SURVIVE THIS REVIEW. SERVICE OF THAT CLAIM WILL BE ORDERED IN A SEPARATE MEMORANDUM ORDER.**

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14)days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglas v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

In Chambers, Alexandria, Louisiana, _____, 2010.

JAMES D. KIRK
United States Magistrate Judge

37